UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
TARROS S.p.A.,                                      :
                                                    :
                                    Plaintiff,      :          13 Civ. 1932 (JPO)
                                                    :
                  -v-                               :          OPINION AND ORDER
                                                    :
THE UNITED STATES OF AMERICA,                       :
                                                    :
                                    Defendant.      :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

 Tarros S.p.A. ("Plaintiff") brings this tort action against the United States of America

("Government") pursuant to the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 30901 *et seq.*, and

the Public Vessels Act ("PVA"), 46 U.S.C. § 31101 *et seq.*, to recover damages allegedly

incurred when a United States naval warship—the *USS STOUT* ("Stout")—blockaded and

diverted Plaintiff's chartered vessel—the *M/V VENTO DI PONENTE* ("Vento")—in

international waters near Tripoli, Libya during Joint Task Force Operation Odyssey Dawn.

Plaintiff contends that the Stout's actions violated United Nations Security Council Resolutions

1970 and 1973 ("Resolution 1970" and "Resolution 1973"), NATO's Navigation

Warning/Warning to Mariners ("NAVWARN/NTM"), and international maritime law as set

forth in the United Nations Convention on the Law of the Sea ("UNCLOS").  The Government

has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter

jurisdiction on the ground that this case presents a non-justiciable political question.  Because

adjudication would require reexamination of discretionary military decisions related to military

operations, and because the international agreements relied upon by Plaintiff are not enforceable

in United States courts, the Government's motion to dismiss is granted.

## I.     Background

### A.     Factual Background

The following facts are, unless otherwise indicated, taken from the allegations in the Complaint (*see* Dkt. No. 1 ("Compl.").)

### 1.     The Libyan Civil War and the International Community's Response

In February 2011, amid widespread demonstrations and protests in parts of the Middle East and North Africa, citizens in Libya began protesting against the government of Colonel Muammar Qadhafi.  In an effort to swiftly crush the protests, Qadhafi authorized the use of military force, "including strafing of protesters and shelling, bombing, and other violence deliberately targeting civilians."  (Dkt. No. 8 ("Rosa Decl."), Ex. A ("DOJ Mem. Op.").)  The United Nations Security Council ("Security Council") responded on February 26, 2011 by unanimously adopting Resolution 1970, which demanded an immediate end to violence against Libyan citizens and instituted an arms embargo upon the Libyan government, as well as a travel ban and asset freeze upon certain individuals.  S.C. Res. 1970, U.N. Doc. S/RES/1970 (Feb. 26, 2011).  With respect to the arms embargo, Resolution 1970 provided that "Member States shall immediately take the necessary measures to prevent the direct or indirect supply, sale or transfer to the Libyan Arab Jamahiriya . . . of arms and related materiel of all types."  *Id.* ¶ 9.  To accomplish this, Member States were instructed "to inspect . . . consistent with international law, in particular the law of the sea . . . all cargo to and from the Libyan Arab Jamahiriya . . . if the State concerned has information that provides reasonable grounds to believe the cargo contains items prohibited" under the embargo, *id.* ¶ 11; to "seize and dispose" of any contraband, *id.* ¶ 12; and to "submit promptly an initial written report to the Committee [established pursuant to the Resolution] containing . . . [an] explanation" of the grounds, results, and details of the inspection, *id.* ¶ 13.

On March 1, the United States Senate passed Resolution 85, urging the Security Council to take further action to protect Libyan citizens.  S. Res. 85, 112th Cong. §§ 2, 3, 7 (2011).  On March 17, as Qadhafi prepared to retake the city of Benghazi and threatened to show no mercy to opposition forces (DOJ Mem. Op.,) the Security Council adopted Resolution 1973, which imposed a no-fly zone, authorized military force to protect civilians, and extended the arms embargo, travel ban, and asset freeze, S.C. Res. 1973, U.N. Doc. S/RES/1973 (Mar. 17, 2011). With respect to protection of civilians, Member States were authorized "to take all necessary measures, notwithstanding paragraph 9 of resolution 1970 . . . to protect civilians, and civilian populated areas under threat of attack in the Libyan Arab Jamahiriya."  *Id.* ¶ 4.  "[I]n order to ensure strict compliance with the arms embargo," Member States were now authorized "to use all measures commensurate to the specific circumstances to carry out . . . inspections, *id.* ¶ 13, but were "[r]equest[ed] . . . to inform the Secretary-General and the Committee . . . immediately of measures taken in the exercise of [such] authority," *id.* ¶ 14.  Like Resolution 1970, Resolution 1973 "[r]equire[d] any Member State . . . when it undertakes an inspection . . . to submit promptly an initial written report to the Committee containing . . . [an] explanation" of the grounds, results, and details of the inspection.  *Id.* ¶ 15.

In remarks on March 18, President Obama demanded that Qadhafi cease hostilities to avoid military intervention by the United States to enforce Resolution 1973, and identified several national interests justifying U.S. involvement, including the atrocities committed against the Libyan people, destabilization in the region, and the need to enforce the international community's commands.  (DOJ Mem. Op.)  Although Libya's foreign minister stated that Libya would honor the requested ceasefire, the Libyan government continued to use force against civilians.  (*Id.*)  On March 19, the United States and its coalition partners launched airstrikes against Libyan targets.  (*Id.*)  Pursuant to the War Powers Resolution, 50 U.S.C. § 1543(a),

within forty-eight hours of the operation the President submitted an explanatory report to Congress, which described the airstrikes as "limited in their nature, duration, and scope" and undertaken in furtherance of the international coalition's enforcement of Resolution 1973.  (*Id.*)  As authority for the operation, the President invoked his "constitutional authority to conduct U.S. foreign relations" and his authority as "Commander in Chief and Chief Executive," and cited the national interests identified during his remarks on March 18.  (*Id.*)

### 2.       The Incident

Plaintiff is a shipping company specializing in maritime liner service for the transport of general cargo in maritime containers within the Mediterranean Sea.  Plaintiff's principal place of business is in La Spezia, Italy.  On or about December 16, 2010, Plaintiff entered into a contract with Nautique Shipping Co. Ltd. for the hire of the Vento.[1]  The Vento is a general cargo ship and at all times relevant to this matter flew the flag of Cyprus.

On or about March 18, 2011, the Vento sailed from La Spezia to Tripoli carrying 168 containers of general cargo.[2]  Prior to departure, Plaintiff was informed by its local shipping agents in Tripoli that the city's port was open and fully operational.  Plaintiff also notified the Crisis Unit of the Italian Ministry of Foreign Affairs of its intended voyage and submitted the ship's cargo manifest to the Customs Authority, which released an authorization of compliance.  On March 21, Plaintiff's shipping agents reiterated via fax that the port was "working normally without any problems or disturb[ances] and . . . able to accept any vessels."

---

[1] Plaintiff states in its Complaint that it chartered the Vento on or about December 16, 2011, but the Court assumes based upon the chronology of events that Plaintiff intended to state December 16, 2010.

[2] Plaintiff alleges that the Vento was carrying "medical equipment, medicine, first aid supplies, and food stuffs" and provides a copy of the cargo manifest.  (Dkt No. 12 ("Pl.'s Opp'n"); Dkt. No. 14 ("Tisdale Decl.," Exs. A, B ("Cargo Manifest")).)

On March 22, 2011, at approximately 0410 hours, the Vento was stopped in international waters outside of Tripoli by the Stout, a United States naval warship acting in support of Operation Odyssey Dawn.  Via radio, the Stout inquired about the identity of the owner and charterer of the Vento, the nationality of its master, and its cargo, crew, passengers, and destination.  The Stout then informed the Vento that "in accordance with United Nations Council Resolutions 1970 and 1973 [the Stout] was directed not to allow the Vento . . . to enter Libyan territorial waters and [the Vento] was instead directed to proceed to Trapani, Italy."  At no time did the Stout request to board the Vento to inspect the ship or its cargo.

The Vento's master informed the Stout that he would sail the ship to within 30 miles of Tripoli and stop its main engines.  At approximately 0500 hours, the master stated that he needed to wait until morning to contact the Vento's owners for instructions, and stopped the ship's main engines.  At approximately 0535 hours, the Stout ordered the Vento to proceed to its next destination immediately.  The master replied that he would restart the ship's main engines and set a course for Malta.  At approximately 0600 hours, the Vento proceeded toward Malta, escorted by the Stout.  At approximately 0711 hours, the Stout approached the port quarter of the Vento, which caused the alarm for the "Fire on Bridge Deck" to go off and the ship's navigation and communications equipment to malfunction.  The Vento and Stout continued to Malta and arrived at approximately 1530 hours, at which point the Stout departed.  The Vento remained in the vicinity of Malta until March 25, when Plaintiff, realizing the impossibility of completing the voyage, directed the ship to return to La Spezia.

### B.    Procedural Background

Plaintiff duly filed a claim with the Department of the Navy, which was denied by U.S. Navy Judge Advocate General Captain A.B. Fisher in letters dated March 4 and March 18, 2013.

(Tisdale Decl., Ex. B ("March 4 Letter"); Ex. C ("March 18 Letter").)[3]  Plaintiff filed this action

on March 22, 2013, seeking approximately $675,000 in damages plus interest under theories of

negligence, negligent or intentional intervention on the high seas, intentional interference with

commercial activity, intentional destruction of property, and negligent destruction of property.

(Compl.)[4]  The Government moved to dismiss on June 5, 2013.  (Dkt. No. 7 ("Def.'s Mem.").)

Plaintiff opposed the motion on June 19, 2013.  (Pl.'s Opp'n.)  The Government replied on June

26, 2013.  (Dkt. No. 16 ("Def.'s Rep.").)

## II.   Legal Standard

"The political question doctrine is more properly characterized as a 'justiciability'

question than as a question of subject matter jurisdiction.  Nevertheless, it is properly raised on a

motion under Rule 12(b)(1)."  *Aiello v. Kellogg, Brown & Root Servs., Inc.*, No. 09 Civ. 7908

(PKC), 751 F. Supp. 2d 698, 702 (S.D.N.Y. 2011) (citations omitted).  A motion to dismiss

under Rule 12(b)(1) is decided under the same standard as a motion to dismiss under Rule

12(b)(6).  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).  The Court must accept

all material facts alleged in the Complaint as true and draw all reasonable inferences liberally in

Plaintiff's favor.  *Kwiatkowski v. Polish & Slavic Fed. Credit Union*, 511 Fed. App'x 117, 118

(2d Cir. 2013).  The Court may consider evidence outside of the pleadings.  *Morrison v. Nat'l

Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

---

[3] In the March 4 Letter, Captain Fisher stated that the Stout was acting "in accordance with
United Nations Security Council Resolutions 1970 and 1973" and that "the United States was
acting under Chapter VII of the United Nations Charter to enforce these resolutions."  He further
stated that "there is insufficient evidence that USS STOUT or her crew acted negligently during
this incident."  (March 4 Letter.)  In the March 18 Letter, Captain Fisher cited the specific
provisions of Resolutions 1970 and 1973 purportedly authorizing the Stout's actions.

[4] This Court has subject matter jurisdiction over this action pursuant to the SIAA, PVA, and 28
U.S.C. § 1333.  Venue is proper pursuant to § 31104 of the PVA.

### III.   Discussion

### A.   Political Question Doctrine

The political question doctrine is "essentially a function of the separation of powers,"
*Baker v. Carr*, 369 U.S. 186, 217 (1962), and "excludes from judicial review those controversies
which revolve around policy choices and value determinations constitutionally committed for
resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling
Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Massachusetts v. E.P.A.*, 549
U.S. 497, 516 (2007) ("It is therefore familiar learning that no justiciable 'controversy' exists
when parties seek adjudication of a political question."); *Lane v. Halliburton*, 529 F.3d 548, 559
(5th Cir. 2008) (where a claim raises a political question, "the very design of our federal
government compels the Plaintiff to seek redress from the political branches").[5]  The doctrine
has its origin in *Marbury v. Madison*, 5 U.S. 137 (1803), where, even as Chief Justice Marshall
proclaimed that "[i]t is emphatically the province and duty of the judicial department to say what
the law is," *id.* at 177, he recognized that:

> The province of the court is, solely, to decide on the rights of
> individuals, not to enquire how the executive, or executive officers,
> perform duties in which they have a discretion.  Questions, in their
> nature political, or which are, by the constitution and laws,
> submitted to the executive, can never be made in this court.

*Id.* at 170.[6]

---

[5] The doctrine has also been described in terms of deference to the political branches.  *See, e.g.*,
*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 261 (2d Cir. 2007); *Whiteman v.
Dorotheum GmbH & Co. KG*, 431 F.3d 57, 69 (2d Cir. 2005); Rachel E. Barkow, *More Supreme
Than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*,
102 Colum. L. Rev. 237, 242 (2002).

[6] *See also* The Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("If it
be said that the legislative body are themselves the constitutional judges of their own powers and
that the construction they put upon them is conclusive upon other departments it may be

Over two hundred years of elaboration have done little to clarify the distinction between questions of "the law" and "questions, in their nature political," and the doctrine remains "more amenable to description by infinite itemization than by generalization."  John P. Frank, Political Questions, in *Supreme Court & Supreme Law* 36 (E. Cahn ed., 1954); *see also Baker*, 369 U.S. at 210 (observing that the attributes of the doctrine "in various settings, diverge, combine, appear, and disappear in seeming disorderliness"); *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) (Posner, J.) ("The scope, rationale, provenance, and legitimacy of the doctrine remain profoundly unclear."); Charles Alan Wright, *The Law of Federal Courts* 74 (4th ed. 1983) ("No branch of the law of justiciability is in such disarray as the doctrine of the 'political question.'").  The Supreme Court has, however, identified six independent hallmarks of political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable standards for resolving it; or
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due to coordinate branches of government; or
> [5] an unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.[7]  While the presence of any of these formulations gives rise to a political question, "[u]nless one . . . is *inextricable* from the case at bar, there should be no dismissal for

---

answered that this cannot be the natural presumption where it is not to be collected from any particular provisions in the Constitution.").

[7] *See also Vieth v. Jubelirer*, 541 U.S. 267, 277 (2007) (plurality) (noting that the *Baker* factors are "probably listed in descending order of both importance and clarity").

non-justiciability on the ground of a political question's presence." *Id.* (emphasis added). Thus, courts have denied motions to dismiss where discovery was necessary to determine whether a political question would inevitably arise.[8] The Government argues that most, if not all, of the *Baker* factors are present in this case.

### B.    Military Discretion Related to Military Operations

The Constitution primarily entrusts foreign relations and military affairs to the political branches.  U.S. CONST. art. I, § 8, cls. 1, 3-5, 10-16 (granting Congress the power to provide for the common defense, regulate foreign commerce, immigration, and the military, declare war, and define and punish offenses on the high seas and against the law of nations); U.S. CONST. art. II, § 2, cls. 1-2 (designating the President as Commander-in-Chief of the military, and granting him the power to make treaties and appoint ambassadors with the advice and consent of the Senate); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)); *United States v. Stanley*, 483 U.S. 669, 682 (1987) (noting "the insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches"); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) (Clarke, J.) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—

---

[8] *See, e.g.*, *Lane*, 529 F.3d at 554 (reversing district court's dismissal on political question grounds, reasoning that "further factual development [is needed] before it can be known whether the doctrine is actually an impediment"); *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 619-20 (D.C. Cir. 2006) (remanding to district court for further factual development to determine whether case presented a political question); *Smith v. Halliburton Co.*, 2006 WL 2521326, at *1 (S.D. Tex. Aug. 30, 2006) (noting that the court had previously declined to dismiss where "there was not a sufficient factual predicate to determine whether the case presents a nonjusticiable political question").

departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.") (citations omitted).  In contrast, the Judiciary's role is secondary, incidental to its exercise of jurisdiction over enumerated categories of cases and controversies.  U.S. CONST. art. III, § 2, cl. 1 (extending the judicial power to, *e.g.*, cases arising under treaties and affecting ambassadors, and controversies involving foreign states and citizens); *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) (observing that such provisions are merely an extension of jurisdiction and "provide[] no authority for policymaking in the realm of foreign relations or provision of national security").  Cases touching upon foreign relations and military affairs are, therefore, particularly sensitive to political question concerns. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Baker*, 369 U.S. at 211 (noting that "resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of discretion demonstrably committed to the executive or legislative," or "uniquely demand single-voiced statement of the Government's views"); *El-Shifa Pharm. Indus. Co. v. United States*, 559 F.3d 578, 583 (D.C. Cir. 2009) ("Disputes involving national security and foreign policy decisions are 'quintessential sources of political questions.'") (quoting *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006)), *aff'd en banc*, 607 F.3d 836 (D.C. Cir. 2010).

Nevertheless, "it cannot of course be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (quoting *Baker*, 369 U.S. at 211).  "[T]hat a case may involve the conduct of the nation's foreign affairs does not necessarily prevent a court from determining whether the Executive has exceeded the scope of prescribed statutory authority or failed to obey the prohibition of a statute or treaty," *El-Shifa*, 607 F.3d at 842 (citing *Japan*

*Whaling*, 478 U.S. at 230), and "[e]ven in the context of military action, the courts may sometimes have a role," *id.* at 841 (citing *Gilligan v. Morgan*, 413 U.S. 1, 11-12 (1973)). Judicial review is particularly appropriate where the court is "faced with an ordinary tort suit," because "[t]he department to whom th[e] issue has been 'constitutionally committed' is none other than our own." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991). It would therefore be erroneous to rely upon the 'foreign relations' or 'military affairs' label without conducting a "discriminating analysis of the particular question posed." *Baker*, 369 U.S. at 211; *see also Lane*, 529 F.3d at 558 ("The *Baker* analysis is not satisfied by 'semantic cataloguing' of a particular matter as one implicating 'foreign policy' or 'national security.'").

In this case, the particular question posed is whether the Stout—and by implication, the military—had a duty under international law to conduct operations in a specified manner, and acted negligently in the performance of that duty by blockading and diverting the Vento. In other words, Plaintiff seeks a determination that the Stout's officers and crew acted unreasonably under the circumstances. It is well established, however, that the political question doctrine generally precludes judicial review of discretionary military decisions related to military operations. *See, e.g.*, *Gilligan*, 413 U.S. at 6 (dismissing action for injunctive relief challenging the Ohio National Guard's "training, weaponry and orders" relating to the control of civil disorder); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1275 (11th Cir. 2009) (dismissing state tort law action against defense contractor challenging military procedures governing the operation of convoys in Iraq); *El-Shifa*, 559 F.3d at 583-84 (dismissing action under the law of nations and Federal Tort Claims Act ("FTCA") challenging the President's decision to strike a suspected terrorist target); *Schneider*, 412 F.3d at 191-94 (dismissing action under the FTCA challenging the President's authorization of covert operations to prevent Salvador Allende from becoming the president of Chilé); *Aktepe v. United States*, 105 F.3d 1400,

1404 (11th Cir. 1997) (dismissing action under the PVA and Death on the High Seas Act

("DOHSA") challenging military communication, training, and drill procedures related to NATO

training exercises); *DaCosta v. Laird*, 471 F.2d 1146, 1157 (2d Cir. 1973) (dismissing

declaratory action challenging the President's authority to order the mining of North Vietnam

harbors during the Vietnam War); *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736,

737-38 (S.D.N.Y. 1986) (dismissing action under the SIAA and FTCA challenging the CIA's

clandestine placement of bombs in a Nicaraguan harbor); *In re Korean Air Lines Disaster of*

*Sept. 1, 1983*, 597 F. Supp. 613, 614, 616 (D.D.C. 1984) (dismissing action under the SIAA and

DOHSA challenging the deployment of military aircraft in the Sea of Japan).  As the Supreme

Court explained in *Gilligan*, such cases typically implicate *Baker*'s first two factors:

> It would be difficult to think of a clearer example of the type of
> governmental action that was intended by the Constitution to be
> left to the political branches directly responsible—as the Judicial
> Branch is not—to the electoral process.  Moreover, it is difficult to
> conceive of an area of governmental activity in which the courts
> have less competence.  The complex, subtle, and professional
> decisions as to the composition, training, equipping, and control of
> a military force are essentially professional military judgments,
> subject *always* to civilian control of the Legislative and Executive
> Branches.

413 U.S. at 10.

This case is no exception.  The decision as to whether to divert a vessel bound for a war-

torn nation in order to enforce an international arms embargo is a "delicately-calibrated [one]

based on military judgment, experience, and intelligence-gathering."  *Carmichael*, 572 F.3d at

1282.  Far from an "ordinary tort suit," *Klinghoffer*, 937 F.2d at 50, adjudication would require

the Court to wade into the heart of military operations, "interjecting tort law into the realm of

national security and second-guessing judgments . . . that are properly left to the other constituent

branches of government," *Tiffany v. United States*, 931 F.2d 271, 275 (4th Cir. 1991).  Military

judgments such as these are paradigmatic of discretionary decisions constitutionally committed to the Executive Branch. *See, e.g.*, *El-Shifa*, 559 F.3d at 583-84 ("[C]ourts are not a forum for second-guessing the merits of foreign policy and national security decisions textually committed to the political branches."); *DaCosta*, 471 F.2d at 1154 (recognizing the "Constitution's specific textual commitment of decision-making responsibility in the area of military operations in a theatre of war to the President, in his capacity as Commander in Chief"); *Starkist Foods, Inc. v. United States*, 1992 WL 142591, at *1 (E.D. La. June 5, 1992) (dismissing action under the PVA and SIAA for damages incurred when artillery shells fired by U.S. naval forces during Operation Just Cause in Panama accidentally struck plaintiffs' vessel, because the damages "were a direct result of" the operation, which was a non-reviewable exercise of the President's authority as Commander-in-Chief).

Plaintiff cites the Second Circuit's decision in *Klinghoffer* and this Court's decision in *Aiello* as examples in which tort claims have been permitted in similar contexts. Yet, contrary to Plaintiff's characterization, *Klinghoffer* was an action against private defendants including the Palestine Liberation Organization, not the Government, and was justiciable precisely because, *inter alia*, "both the Executive and Legislative Branches ha[d] expressly endorsed the concept of suing terrorist organizations in federal court." 937 F.2d at 49. *Aiello*, an action against a military contractor, rested its holding on the fact that "the allegation . . . could stand alone and support a claim without implicating any military decisions" and the court consequently would "not '*inevitably* be drawn into a reconsideration of military decisions.'" 751 F. Supp. 2d at 706 (citation omitted). Rather than supporting justiciability, these cases show that judicial review is less likely to be appropriate where the Executive Branch opposes it, *see, e.g.*, *Whiteman*, 431 F.3d at 69-71, or where it would entail reconsideration of military operations over which the Government, rather than a private actor, exercised control, *see, e.g.*, *Taylor v. Kellogg Brown &*

13

*Root Servs., Inc.*, 658 F.3d 402, 411 (4th Cir. 2011) (dismissing action against private contractor because "an analysis of [its] contributory negligence defense would invariably require the Court to decide whether . . . the Marines made a reasonable decision") (citation and quotation marks omitted); *Carmichael*, 572 F.3d at 1281-85 (dismissing action against private contractor because the military exercised control over the relevant operations); *Lane*, 529 F.3d at 563 (declining to dismiss action against private contractor because "[t]he court will be asked to judge KBR's policies and actions, not those of the military or Executive Branch"). *See generally McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1322 (M.D. Fla. 2006) ("The key inquiry is whether a court will have to question the wisdom of military operations and decision-making, or . . . need only consider the private contractor's performance under the contract.").[9] Here, the Government opposes adjudication on political question grounds, and the claims squarely challenge activities over which the military had control.

Perhaps realizing the futility of a direct challenge to the Executive's discretion in enforcing the arms embargo, Plaintiff attempts to recast its challenge as one against "a single rogue Captain's unauthorized enforcement of" Resolutions 1970 and 1973. (Pl.'s Opp'n.) But just as "it is not for the federal courts to review the President's battlefield decisions," *El-Shifa*, 559 F.3d at 583, so "the same considerations . . . preclude judicial examination of the manner in which that decision was executed by subordinate officials," *Rappenecker v. United States*, 509 F.

---

[9] Plaintiff briefly suggests that the incident in this case did not occur in the context of hostilities because it was miles away from Libya in international waters. While the Court disagrees with the suggestion that the naval enforcement of an arms embargo to prevent weapons and militants from entering a country immersed in civil war does not constitute "hostilities," in any event, the scope of the political question doctrine is not so limited. *See, e.g.*, *Carmichael*, 572 F.3d at 1287 (rejecting plaintiff's suggestion that "a military decision is unreviewable only if it somehow pertains to battlefield or combat activities," because "[w]hile decisions relating to [such] issues are paradigmatically insulated from judicial review, it is neither necessary nor sufficient for purposes of the political question doctrine that military decisions relate to such matters") (citations omitted).

Supp. 1024, 1030 (N.D. Cal. 1980) (recognizing that the "textual commitment to the President as commander in chief of authority for military decisions entails that his decisions may be implemented without judicial scrutiny") (citations omitted).  "In such cases, their acts are [the President's] acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no [judicial] power to control that discretion."  *Marbury*, 5 U.S. at 166; *see also Baker*, 369 U.S. at 245 (Douglas, J., concurring) ("Where the performance of a 'duty' is left to the discretion and good judgment of an executive officer, the judiciary will not compel the exercise of his discretion one way or the other, for to do so would be to take over the office.") (citations omitted); *Bancoult*, 445 F.3d at 436-37 (dismissing challenge to "specific tactical measures" taken to depopulate the Chagos Archipelago and establish a military base because, absent a violation of constitutionally protected rights, "[t]he courts may not bind the executive's hands on matters such as these, whether directly—by restricting what may be done—or indirectly—by restricting how the executive may do it"); *Nejad v. United States*, 724 F. Supp. 753, 755 (C.D. Cal. 1989) (rejecting plaintiffs' characterization of action as challenging "only the negligent manner in which the President's decision was carried out," because adjudication would still "call[] into question the Navy's decisions and actions in execution of those decisions").  Insofar as Plaintiff implies that the Stout's officers and crew were acting *contrary to* military orders—which is at odds with its allegation in the Complaint that the Stout stated that it was acting in accordance with Resolutions 1970 and 1973—Plaintiff has sued the Government, not the Stout's officers and crew, and must therefore allege negligence on the part of the military, *e.g.*, with respect to training or communications procedures, or the rules of engagement.  *See, e.g.*, *Aktepe*, 105 F.3d at 1404 (rejecting plaintiffs' "effort to cast their suit as a common negligence action directed at lower-level military operatives" because the allegations "launch[ed] a far more sweeping assault on the

Navy's practices," including the Navy's "communication, training, and drill procedures");

*Zuckerbraun v. General Dynamics Corp.*, 755 F. Supp. 1134, 1135, 1142 (D. Conn. 1990)

(dismissing tort action under DOHSA against weapons manufacturer for negligent design

because adjudication would require the court "to examine the appropriateness of the rules of

engagement and . . . standing orders, which are committed to the executive branch," as well as

"the appropriateness of the reaction of the *USS STARK* crew to" an attack by an Iraqi aircraft).

   This conclusion is buttressed by the absence of judicially manageable and discoverable

standards for resolving this case.  *See Nixon v. United States*, 506 U.S. 224, 228-29 (1993)

("[T]he lack of judicially manageable standards may strengthen the conclusion that there is a

textually demonstrable commitment to a coordinate branch.").  While Plaintiff suggests that the

common law of tort provides the relevant standard, it does not propose a specific standard to

govern the conduct of a naval warship subject to military control in enforcing an international

arms embargo, and this Court declines to "fashion[] out of whole cloth some standard for when

military action is justified."  *El-Shifa*, 607 F.3d at 845.  Without a civilian analogue, neither

judges nor juries possess the competence or experience to determine what would be "reasonable"

under the circumstances.  *See, e.g.*, *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S.

103, 111 (1948) ("Such [military] decisions are . . . delicate, complex, and involve large

elements of prophecy . . . .  They are decisions of a kind for which the Judiciary has neither the

aptitude, facilities nor responsibility . . . ."); *El-Shifa*, 607 F.3d at 844-45 ("In military matters in

particular, the courts lack the competence to assess the strategic decision to deploy force or to

create standards to determine whether the use of force was justified or well-founded.");

*Carmichael*, 572 F.3d at 1288-89 (citing lack of experience with dangerous combat

circumstances or military control as reasons that judges and juries would not be able "to draw

upon common sense and everyday experience" to determine the reasonableness of defendant's

actions); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1364 (11th Cir. 2007) (noting that "[t]he case does not involve a sui generis situation such as military combat or training, where courts are incapable of developing judicially manageable standards"); *Aktepe*, 105 F.3d at 1404 ("[C]ourts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life.").[10]

In the face of ample case law indicating that this dispute is not justiciable, Plaintiff cites two cases—*The Paquete Habana*, 175 U.S. 677 (1900), and *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992)—that allowed tort actions for damages challenging military discretion related to military operations. In *Habana*, pursuant to a statute granting federal courts jurisdiction over prize causes, the Supreme Court reviewed the seizure of two Spanish fishing vessels by the Navy during the Spanish-American War. 175 U.S. at 678-79. Although the Court considered at length whether, as a rule of international law, fishing vessels engaged solely in legitimate commerce were subject to capture as prizes, *id.* at 686-708, neither it nor the Government suggested that the case presented a political question. Instead, after concluding that such a rule existed, the Court examined the factual basis for the Navy's decision, determined that "the capture was unlawful and without probable cause," and awarded damages. *Id.* at 712-14.

Nearly a century later in *Koohi*, plaintiffs brought claims under the PVA and FTCA challenging the "negligent operation" of the *USS VINCENNES* after it accidentally shot down an

---

[10] The Government and some courts have cited the unavailability of relevant facts—"military intelligence"—as an additional, independent basis for finding that *Baker*'s second factor is implicated. *See, e.g.*, *Chaser Shipping*, 649 F. Supp. at 739. However, unless such unavailability is inevitable, courts cannot conclude that it is "inextricable" from the case. Accordingly, short of invocation of the state secrets privilege, this Court assumes, in the Plaintiff's favor, that the Government would provide the facts necessary for adjudication.

Iranian civilian aircraft during the Iran-Iraq War.  976 F.2d at 1329-31.[11]  Acknowledging that

the incident occurred during "combat with Iranian naval vessels," *id.* at 1330, the Court

nevertheless concluded that the case was justiciable because plaintiffs sought damages rather

than an injunction, *id.* at 1332.  Citing *Habana*, the Court noted that "[t]he Supreme Court has

made clear that the federal courts are capable of reviewing military decisions . . . ."  *Id.* at 1331.

This conclusion was bolstered, in the Court's view, by *Scheuer v. Rhodes*, 416 U.S. 232 (1974),

where the Supreme Court permitted an action for damages arising out of the 1970 shooting at

Kent State, one year after holding non-justiciable in *Gilligan*, 413 U.S. at 11, an action for

injunctive relief arising out of the same incident.  *Id.* at 1332.

　　While *Habana* and *Koohi* add a wrinkle to the analysis in this case, they do not change

the result.  *Habana* is inapposite for at least three reasons.  First, whereas Congress has expressly

granted jurisdiction to federal courts over prize causes, *see* 10 U.S.C. § 7652, no statute or treaty

authorizes courts to determine whether military actions taken to enforce international obligations

such as Resolutions 1970 and 1973 were justified, and the Court will not read into general

statutes such as the PVA and SIAA jurisdiction to make such determinations, *see, e.g.*, William

N. Eskridge, Jr., *Dynamic Statutory Interpretation* 325 (1994) (describing "[s]uper-strong rule

against congressional interference with the president's authority over foreign affairs and national

security"); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has

provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the

Executive in military and national security affairs.") (citations omitted).  *Cf. Arar v. Ashcroft*,

585 F.3d 559, 564-65, 574-76 (2d Cir. 2009) (refusing to extend *Bivens* actions to extraordinary

rendition, because such actions "would enmesh the courts ineluctably in an assessment of the

---

[11] An action for damages arising out of the same incident was held non-justiciable several years
earlier in *Nejad*.  724 F. Supp. at 755.  *Koohi* did not mention the case.

validity and rationale of th[e] [extraordinary rendition] policy and its implementation in this particular case, matters that directly affect significant diplomatic and national security concerns"). Second, in *Habana*, the Executive petitioned the judiciary to review the prize for condemnation. 175 U.S. at 679. In contrast, in this case the Government is the defendant and contends that the Court lacks jurisdiction. Third, *Habana* predates *Erie Raiload Co. v. Tompkins*, 304 U.S. 64 (1938), which established that there is no federal general common law. *Habana*'s reliance upon customary international law as a matter of federal general common law to restrain the Executive's military discretion is therefore no longer warranted. *See Al-Bihani v. Obama*, 590 F.3d 866, 870-71 (D.C. Cir. 2010) (recognizing that "[t]he international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts" to restrain the President's war powers), *reh'g en banc denied*, 619 F.3d 1 (D.C. Cir. 2010); *Al-Bihani*, 619 F.3d at 16-19 (Kavanaugh, J., concurring) (arguing that *Habana*'s use of customary international law is inappropriate after *Erie*).[12]

In light of these distinctions, *Koohi*'s interpretation of *Habana* as generally condoning judicial review of actions "taken in the ordinary exercise of discretion in the conduct of war" is not persuasive. 976 F.2d at 1332 (citing *Habana*, 175 U.S. at 715 (Fuller, C.J., dissenting)). Furthermore, while *Scheuer* and *Gilligan* establish that—*ceteris paribus*—damages actions are more likely to be justiciable than injunctive actions, they addressed challenges to military

---

[12] Even after *Erie*, "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 730 (2004) (quoting *Habana*, 175 U.S. at 700). However, courts may no longer create "general" federal common law, and are restricted to "limited enclaves" where Congress has authorized its creation. *Id.* at 729-30. The Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), at issue in *Sosa*, is one such statute where courts have been narrowly authorized to incorporate rules of international law into domestic law. *Id.* (citing the ATS's grant of jurisdiction over torts "committed in violation of the law of nations"). But there is no corresponding language in the PVA or SIAA granting courts similar authority.

19

discretion related to a domestic matter—control of civil disorder—and are of limited relevance here, where the challenged military discretion relates to enforcement of an international arms embargo during hostilities with enemy forces.  *See, e.g.*, *Tiffany*, 931 F.2d at 280 (dismissing tort action under DOHSA challenging the Air Force's procedures for deploying aircraft in domestic airspace to counter perceived threats, but observing that "[w]hen conducting training exercises, for example, or acting in a civilian arena, national defense interests may be more remote" and the political question doctrine therefore may not apply).  As this Court observed in *Chaser Shipping*, "the fact that plaintiffs seek damages and not an injunction does not mitigate separation of powers concerns" where there is still a lack of judicially manageable and discoverable standards. 649 F. Supp. at 738; *see also Carmichael*, 572 F.3d at 1292 (rejecting plaintiff's reliance upon *Koohi* to argue that its action for damages was justiciable, because the court still lacked legal standards with which to judge the case).  And while an award of damages does not require the Government to change its conduct, its coercive effect still undermines the Executive's constitutional authority over military affairs.  Given the constitutional structure and the judiciary's relative lack of competence, this result is more problematic where foreign, rather than domestic, relations are at issue.[13]

In sum, this Court declines to adopt the reasoning of the Ninth Circuit in *Koohi*, which rests upon an unwarranted application of *Habana* and *Scheuer* and constitutes a departure from existing case law.  Plaintiff cannot convert this into a justiciable action by seeking monetary damages rather than injunctive relief, because adjudication would still require reexamination of a discretionary military decision related to military operations and the Court lacks judicially

---

[13] It is not necessary to reach the remaining *Baker* factors because the Court has already concluded that the first two factors apply.  However, at least the fourth factor is implicated in light of the textual constitutional commitment of discretionary military decisions to the political branches and the Court's relative lack of expertise.  *See, e.g.*, *Aktepe*, 105 F.3d at 1404.

manageable and discoverable standards to perform the task.  Accordingly, Plaintiff's claims constitute a political question and are nonjusticiable.

### C.       Effect of International Law on Military Discretion

Plaintiff seeks to escape this conclusion by arguing that the Stout's actions were not a matter of discretion in the first place because they were prohibited under international law. Although "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security," *El-Shifa*, 607 F.3d at 842, they also cannot "shirk [their] responsibility" to give effect to the law "merely because [a] decision may have significant political overtones," *Japan Whaling*, 478 U.S. at 230.  Courts have thus distinguished between claims challenging the wisdom or justification of otherwise lawful military action—political questions—and claims "'[p]resenting purely legal issues' such as whether the government had legal authority to act'"—which are the proper subject of judicial review.  *El-Shifa*, 607 F.3d at 842 (quoting *Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring) (citation omitted)).

Were Plaintiff correct, then, this case would no longer present a political question, but would instead require the Court to determine the constitutionality of an international agreement that prohibits the Executive from exercising full military discretion in the enforcement of the international obligations of the United States.[14]  As explained below, however, none of the

---

[14] This would, at least, raise weighty questions as to whether such an agreement improperly expands the jurisdiction of the federal courts beyond the 'case or controversy' requirement of Article III by requiring judicial review of discretionary military decisions, *see, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972) ("Congress may not confer jurisdiction on Art. III federal courts . . . to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III."), and—if not—whether such an agreement unduly encroaches upon the President's Article II powers, *see, e.g.*, *El-Shifa*, 607 F.3d at 856-57 (Kavanaugh, J., concurring) (observing that application of the political question doctrine is inappropriate where a statute purports to constrain Executive authority because it amounts to "sub silentio expand[ing] executive power . . . .").

sources of international law relied upon by Plaintiff create domestic obligations enforceable in U.S. courts.  Consequently, whatever remedy Plaintiff may be entitled to for the alleged violation constitutes a political question to be determined by the political branches.

### 1.    Resolutions 1970 and 1973

Resolutions 1970 and 1973 lie at the heart of Plaintiff's claims.  Plaintiff asserts that, in specifically authorizing inspections to enforce the arms embargo and requiring Member States to report inspections to the U.N. Secretary-General and Committee, the Resolutions implicitly prohibited other means of enforcement such as blockade and diversion.  In response, the Government cites language in the Resolutions permitting Member States to "take the necessary measures" to enforce the arms embargo and "take all necessary measures" to protect civilians, reasoning that these broad authorizations conferred considerable discretion to the military. While the Government acknowledges that the Resolutions specifically authorized inspection, it also points out that they do not expressly prohibit other means of enforcement.

Interpretive issues aside, the crux of Plaintiff's argument is that Resolutions 1970 and 1973 create binding obligations upon the Government that are enforceable in U.S. courts.[15]  But to imply that all binding obligations are automatically domestically enforceable is to ignore the deep-seated distinction between international obligations and domestic law.  While treaties such as the U.N. Charter "'comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it

---

[15] Plaintiff is not entirely clear about the import of Resolutions 1970 and 1973.  Generally, Plaintiff argues that the Government breached its duty under international maritime law, as reflected in UNCLOS, and it cannot rely upon the Resolutions to justify unauthorized actions. At times, however, Plaintiff could be understood to argue that the Government had a separate, independent duty under the Resolutions to act only as authorized.  While these are distinct theories of liability, they do not change the Court's analysis, which is based upon the principle that international obligations that are not part of domestic law are without legal force in U.S. courts, regardless of the form such force might take.

be 'self-executing' and is ratified on these terms.'" *Medellín v. Texas*, 552 U.S. 491, 505 (2008)

(quoting *Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)

(Boudin, C.J.)); *see also Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (same); *The Head

Money Cases*, 112 U.S. 580, 598-99 (1884) (same).  Similarly, international obligations enacted

*pursuant to* treaties—such as Resolutions 1970 and 1973—do not give rise to rights under

domestic law absent an implementing statute or self-executing terms, and the appropriate remedy

for any violation is a matter constitutionally committed to the political branches.  *See Baker*, 369

U.S. at 217; *see also British Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153, 1159-62 (D.C.

Cir. 1981) (concluding that certain provisions of the Chicago Convention were self-executing

and therefore enforceable in federal court, but not denying the Government's proposition that,

were the provisions non-self-executing, the appropriate remedy for their violation would

constitute a political question).  The Supreme Court has recently addressed the distinction

between international obligations and domestic law in two cases—*Sosa v. Alvarez-Machain*, 542

U.S. 692 (2004), and *Medellín*, 552 U.S. 491.

In *Sosa*, a Mexican national abducted at the direction of a DEA agent brought a claim

against his abductors and the United States for false arrest under the Alien Tort Statute ("ATS"),

28 U.S.C. § 1350.  542 U.S. at 692.  The ATS, enacted in 1789, grants district courts "original

jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of

nations . . . ."  28 U.S.C. § 1350.  In arguing that false arrest constituted a violation of the law of

nations and was therefore actionable under the ATS, the plaintiff cited, *inter alia*, the

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171.  *Sosa*,

542 U.S. at 735.  In rejecting the plaintiff's argument, the Court emphasized that, although the

United States was a party to the treaty, it was not self-executing and therefore not domestically

enforceable:

> [A]lthough the Covenant does bind the United States as a matter
> of *international law*, the United States ratified the Covenant on the
> express understanding that it was not self-executing and so did not
> itself create obligations enforceable in the federal courts.
> Accordingly Alvarez cannot say that the . . . Covenant . . .
> establish[es] the relevant and applicable rule of international law.

*Id.* at 735-36 (emphasis added).

Four years later, the Court considered whether a judgment of the International Court of Justice ("ICJ") is automatically enforceable in United States courts. In *Medellín*, a Mexican national convicted of murder and sentenced to death in Texas state court filed a habeas petition asserting that he was entitled to review of his conviction based upon the ICJ's decision in *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (*Avena*), and a related Presidential Memorandum. 552 U.S. at 497-98. *Avena* held that the petitioner and 50 other Mexican nationals were entitled to reconsideration of their convictions because authorities failed to inform them of their rights under the Vienna Convention on Consular Relations, and President Bush's Memorandum established that, pursuant to his constitutional authority, "the United States will discharge its international obligation under the decision . . . by having State courts give effect to the decision." *Id.* at 497-98, 502-03.

The ICJ is the principal judicial body of the United Nations and was created pursuant to the U.N. Charter. *Id.* at 499. Under the Charter, "[e]ach Member of the United States undertakes to comply with the decision of the [ICJ] in any case to which it is a party." United Nations Charter, Art. 92, 59 Stat. 1051, T.S. No. 993 (1945). "The ICJ's jurisdiction in any particular case, however, is dependent upon the consent of the parties," which may be general or only with respect to a specific case or category of cases, *Medellín*, 552 U.S. at 500 (citing U.N. Charter, Art. 36, 59 Stat. 1060), and the United States had not generally consented to jurisdiction with respect to claims arising out of the Vienna Convention, *id.* at 497, 499. Medellín

24

nonetheless argued that *Avena* constituted a "binding" obligation on the state and federal courts

of the United States because the treaties pursuant to which the decision was issued—including

the U.N. Charter—required federal and state courts to automatically give effect to the judgments

of the ICJ.  *Id.* at 504.  The Court disagreed:

> No one disputes that the *Avena* decision—a decision that flows
> from the treaties through which the United States submitted to ICJ
> jurisdiction with respect to Vienna Convention disputes—
> constitutes an *international* law obligation on the part of the United
> States.  But not all international law obligations automatically
> constitute binding federal law enforceable in the United States
> courts.  The question we confront here is whether the *Avena*
> judgment has automatic *domestic* legal effect such that the
> judgment of its own force applies in state and federal courts.

*Id.*

With respect to the U.N. Charter, the Court held that the language that Member States

would "undertake to comply" with ICJ judgments was not an "indicat[ion] that the Senate that

ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic

courts."  *Id.* at 508.  Instead, "the U.N. Charter reads like 'a compact between independent

nations' that 'depends for the enforcement of its provisions on the interest and the honor of the

governments which are parties to it.'"  *Id.* (citation omitted).  Moreover, adopting Medellín's

interpretation would "undermin[e] the ability of the political branches to determine whether and

how to comply with an ICJ judgment," and "[t]hose sensitive policy judgments would instead be

transferred to state and federal courts charged with applying an ICJ judgment directly as

domestic law."  *Id.* at 511.  Citing political question doctrine language, the Court recognized that

"[t]his result would be particularly anomalous in light of the principle that '[t]he conduct of the

foreign relations of our Government is committed by the Constitution to the Executive and

Legislative—the political—Departments.'"  *Id.* (quoting *Oetjen*, 246 U.S. at 302).

The Court also rejected the plaintiff's argument that the Presidential Memorandum rendered the *Avena* decision domestically enforceable, reasoning that, while Congress has authorized the President to represent the United States before the U.N. and Security Council, "the authority of the President to represent the United States before such bodies speaks to the President's *international* responsibilities, not any unilateral authority to create domestic law." *Id.* at 529. This was not to say that the President was precluded from complying with international treaty obligations in other ways, but only to recognize that "the non-self-executing character of a treaty constrains the President's ability to comply with treaty commitments by unilaterally making the treaty binding on domestic courts." *Id.* at 530.

Both cases are instructive here. Like the ICJ, the Security Council is an organ of the United Nations created pursuant to the U.N. Charter. Like ICJ judgments, Security Council resolutions are promulgated by an organ of the U.N. but are not treaties that have been ratified by the Senate, much less self-executing treaties that are enforceable in U.S. courts. Furthermore, the U.N. Charter does not render resolutions enforceable absent enacting legislation. Under Article 43, Member States are instructed to "*undertake to make available* to the Security Council, on its call and in accordance with a special agreement or agreements, armed forces, assistance, and facilities, including rights of passage, necessary for the purpose of maintaining international peace and security." U.N. Charter, Art. 43, 59 Stat. 1075 (emphasis added). Such language does not indicate an intention by the enacting Senate to vest Security Council resolutions with immediate effect in United States courts. *See Medellín*, 552 U.S. at 508; *Filartiga v. Pena-Irala*, 630 F.2d 876, 882 n.9 (2d Cir. 1980) (observing that the U.N. Charter is a "non-self-executing agreement") (citing *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974)).

Moreover, even if one assumes that Security Council resolutions—international

obligations enacted pursuant to a treaty—could create domestically enforceable obligations, *see,

e.g.*, *Diggs v. Shultz*, 470 F.2d 461, 463 (D.C. Cir. 1972) (recognizing a statute abrogating a

Security Council resolution as a renouncement of a "treaty obligation[] of the United States

under the United Nations Charter"), there is nothing in Resolutions 1970 and 1973 to suggest

that they are self-executing.  Rather, the Resolutions "call upon governments to take certain

action," and do not confer rights upon individuals or provide standards by which courts could

enforce such rights.  *See Diggs v. Richardson*, 555 F.2d 848, 850-51 (D.C. Cir. 1976) (holding

that a Security Council resolution calling on Member States to have no dealings with South

Africa was not self-executing and therefore any remedy for its violation presented a political

question).

Consequently, although the Resolutions "constitute international obligations, the proper

subject of political and diplomatic negotiations," they are not domestically enforceable

obligations.  *Medellín*, 552 U.S. at 520 (citation omitted); *see also Flores v. Southern Peru

Copper Corp.*, 414 F.3d 233, 261 (2d Cir. 2003) (noting that Security Council resolutions are

binding upon Member States, citing Chapter VII of the U.N. Charter).  Indeed, "[t]he point of"

such an international obligation "is that it 'addresses itself to the political, *not* the judicial

department; and the legislature must execute the contract before it can become a rule for the

Court.'"  *Medellín*, at 516 (quoting *Foster v. Neilson*, 27 U.S. 253, 314 (1829)); *see also id.* at

549 (Breyer, J., dissenting) (observing under the dissent's alternative interpretive approach that

"text and history, along with subject matter and related characteristics" aid courts in determining

whether "the treaty provision 'addresses itself to the political . . . department[s]' for further

action or to 'the judicial department' for direct enforcement," and citing treaty provisions related

to the declaration of peace and the promise not to engage in hostilities as examples of the sort

addressed to the political branches) (citations omitted).  That the legislature must "execute the contract" necessarily means that the President, as the nation's representative to the United Nations, cannot unilaterally make the United States' international obligations under the Resolutions binding as a matter of domestic law.  *Id.* at 529.  Nor, of course, should the Court incorporate a rule of international law into domestic law—here, the PVA and the SIAA—when the political branches have not seen fit to do so themselves.  *See Sosa*, 542 U.S. at 735-36; *see also Al-Bihani v. Obama*, 619 F.3d at 9 (Kavanaugh, J., concurring) (concluding that "[i]nternational-law norms that have not been incorporated into domestic U.S. law by the political branches are not judicially enforceable limitations on the President's authority under the AUMF").

### 2.    NATO's Navigation Warning/Warning to Mariners

Plaintiff also relies upon NAVWARN/NTM, which established the proper measures to be used by NATO members in enforcing the arms embargo under Resolutions 1970 and 1973. (Tisdale Decl., Ex. E.)  Paragraph 4 provided that "NATO priority is to reduce interferences and delays caused to merchant shipping traffic to its minimum," and warned vessels that "failure to comply with guidance will result in further investigations . . . [which] will include detailed queries, boardings *or even diversion* to nearby ports for inspection."  *Id.* ¶ 4 (emphasis added). Plaintiff claims that NAVWARN/NTM's listing of diversion as a last resort informs the interpretation of Resolutions 1970 and 1973.  The Government emphasizes that NAVWARN/NTM was issued on March 23, 2011, one day after the incident, and, in any event, was by its own terms "complementary of the action of NATO."  *See id.* ¶ 4.  Putting to the side the Government's persuasive arguments, there is nothing in NAVWARN/NTM or the North Atlantic Treaty, Apr. 4, 1949, 34 U.N.T.S. 243, to suggest that international obligations incurred pursuant to NAVWARN/NTM constitute domestically enforceable obligations.  Accordingly,

under the analysis of Resolutions 1970 and 1973, any remedy for violation of NAVWARN/NTM constitutes a political question.

### 3.     United Nations Convention on the Law of the Sea

Finally, Plaintiff cites UNCLOS for the duty to respect the rights of freedom of the seas and navigation.  Article 87 establishes a right to "freedom of the high seas . . . [which] comprises, inter alia . . . freedom of navigation," and Article 88 provides that "[t]he high seas shall be reserved for peaceful purposes."  Dec. 10, 1982, 1833 U.N.T.S. 397, 432-33.  Plaintiff interprets these provisions to impose a duty upon parties to the Convention, and argues that this duty requires interferences with the right to freedom of the high seas to be conducted in a reasonable, professional, and least intrusive manner.  The Government responds that Plaintiff's reliance upon UNCLOS is misplaced because it has not been ratified by the United States[16] and therefore does not give rise to a private cause of action.  *See, e.g.*, *Flores*, 414 F.3d at 256, 257 n.34 (observing that "only States that have ratified a treaty are legally obligated to uphold the principles embodied in that treaty," and even a ratified treaty does not give rise to a private cause of action if it is not self-executing or implemented by statute).  The Government also observes that, in any event, the United States has not waived sovereign immunity with respect to such claims.  *See, e.g.*, *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011).

While the Government's contentions are correct, they are also beside the point. Plaintiff's claims arise under the PVA and the SIAA, not UNCLOS, and Plaintiff never suggests that it has a separate cause of action under UNCLOS.  To the extent that Plaintiff invokes UNCLOS, the Court understands it to argue—and assumes *arguendo*—that the Convention's

---

[16] *See* United Nations, Oceans & Law of the Sea, *Chronological Lists of Ratifications of, Accessions and Successions to the Convention and the Related Agreement*, http://www.un.org/depts/los/reference_files/chronological_lists_of_ratifications.htm#.

provisions are reflective of customary international law and, therefore, would inform the standard of care by which the military is bound.  *See, e.g.*, *United States v. Jho*, 534 F.3d 398, 407 (5th Cir. 2008); *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 304 n.14 (1st Cir. 1999).[17]  In light of the Court's conclusion that this case presents a political question, UNCLOS is irrelevant.

## IV.   Conclusion

In remarks on March 28, 2011, President Obama recognized that if the United States and its coalition partners had not taken action in Libya, "[t]he writ of the United Nations Security Council would have been shown to be little more than empty words, crippling that institution's future credibility to uphold global peace and security."  Remarks by the President in Address to the Nation on Libya (Mar. 28, 2011), *available at* http://www.whitehouse.gov/photos-and-video/video/2011/03/28/president-obama-s-speech-libya#transcript.  The same would be true, of course, if the United States and others ignored the provisions of the very obligations they purport to enforce.  "That *courts* cannot enforce non-self-executing or non-incorporated international law against the President does not imply the United States would escape consequences of breach on the international plane."  *Al-Bihani*, 619 F.3d at 8 n.8 (Brown, J., concurring) (emphasis added). In holding that this case presents a nonjusticiable "political" question, the Court merely recognizes that certain questions are not appropriate for judicial review, and are instead left to the electorally accountable branches for resolution.  Nothing prevents the President from adhering to this nation's international obligations, or Congress from passing legislation to give them legal effect in the courts.

---

[17] To the extent that Plaintiff alternatively argues that UNCLOS constrains the Executive's military discretion in enforcing Resolutions 1970 and 1973—as opposed to informing the standard of care in a tort action—the Court rejects this argument under its analysis of Resolutions 1970 and 1973.

For the foregoing reasons, the Government's motion to dismiss pursuant to Rule 12(b)(1) is hereby GRANTED.

The Clerk of Court is directed to terminate the motion at Docket No. 6 and to close this case.


SO ORDERED.

Dated: New York, New York
       November 19, 2013

_____
           J. PAUL OETKEN
     United States District Judge